IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 2:17-CR-025-D |
| | § | |
| MICHAEL JAMES URBAN (1), and | § | |
| CHRISTOPHER PATRICK | § | |
| TALBOT (2), | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Defendants Michael James Urban ("Urban") and Christopher Patrick Talbot

("Talbot")—who are charged with the offense of possession with intent to distribute 50

grams or more of actual methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and

§ 841(b)(1)(A)(viii)—move to suppress all evidence, including contraband and photographs,

seized in connection with the stop of a vehicle that Urban was driving and in which Talbot

was a passenger, and all statements made by them at or after their arrest. Following an

evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On March 24, 2017 Texas Department of Public Safety ("DPS") Sergeant Daniel

Rangel ("Sgt. Rangel") was patrolling Interstate Highway 40 in Carson County, Texas. Sgt.

---

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion
and order its essential findings.

Rangel has worked for DPS for approximately 12 years. He became a canine handler in 2009, after completing a three-month course in canine handling, and has been a technical trainer for drug detecting dogs since 2014. Sgt. Rangel supervises canine handlers in his region, which includes four canine handlers and four drug detecting dogs. Sgt. Rangel has made approximately 30 traffic stops that resulted in large narcotics seizures.

Sgt. Rangel's drug detecting dog, Triton, is trained to detect marihuana, cocaine, heroin, and methamphetamine. Triton has been certified through DPS since 2014. Sgt. Rangel and Triton began working together full-time in November 2016, and they were certified as a team by DPS in December 2016, which was approximately three and a half months before the stop of Urban and Talbot. Sgt. Rangel and Triton were certified again in May 2017, approximately two months after the stop, which was their annual certification. During each certification, DPS evaluators rate the team's overall performance as satisfactory or unsatisfactory, and rate the dog as excellent, good, fair, poor, or unacceptable in multiple performance categories. While working as a team, Sgt. Rangel and Triton have been rated as satisfactory in every certification, and Triton has been rated good or excellent in every category.

Sgt. Rangel and Triton also train for a minimum of eight hours each week, which is required to include at least ten "unknown exercises" in which the handler is unaware of where drugs are hidden (also known as single blind controls). The weekly training exercises include vehicle exterior searches, vehicle interior searches, and building searches.

Triton is an aggressive alert dog, which means that his final, trained response is to bite

or scratch when he detects the odor of certain drugs. Sgt. Rangel has also observed Triton signal the presence of drugs by exhibiting other odor responses such as pulling his handler towards a source of odor or breathing heavily and in an excited manner.

On March 24, 2017 Sgt. Rangel was patrolling Interstate 40 and conducting "roadside training" for a DPS criminal interdiction course. At approximately 11:00 a.m. Sgt. Rangel was traveling westbound and observed defendants' white Ford Mustang traveling eastbound; he observed that the Mustang was traveling in the left lane while not passing other vehicles, and that the occupants were focused on another patrol car that was conducting a traffic stop on the side of the road. Sgt. Rangel turned around to follow the Mustang. While he was catching up to it, he observed that the Mustang continued to travel in the left lane while not passing, even as it drove by two sets of signs that were marked "Left Lane for Passing Only." On cross-examination, Sgt. Rangel admitted that when he caught up to the Mustang it was closing on a semi truck some distance ahead, which could have led to the vehicle's passing the semi truck.[2]

When Sgt. Rangel caught up to defendants' vehicle, he first approached it on the right to observe the occupants inside, then moved into the left lane behind it and effected a traffic stop. He noticed that, once the car pulled over and came to a stop, the driver left the blinker on, which from his experience was a sign that the driver was distracted.

---

[2]Sgt. Rangel also observed the Mustang drift toward the center stripe, and then return to the center of the left lane, without using a turn signal. The court is not relying on this alleged traffic violation as a basis to justify the traffic stop.

Sgt. Rangel approached the rear driver side of defendants' vehicle and asked the driver (Urban) to step out. Urban met Sgt. Rangel behind the car. Sgt. Rangel informed Urban of the reason for the traffic stop. He asked Urban for his driver license and asked whom the vehicle belonged to. Urban said that the vehicle was a rental, and Sgt. Rangel then asked for the rental agreement. Urban showed Sgt. Rangel his driver license and his concealed handgun license.

Sgt. Rangel believed that Urban, by showing his concealed handgun license, intended to give him the impression that he was a law-abiding citizen, because the license requires a background investigation. On cross-examination, Sgt. Rangel acknowledged that both Texas and North Carolina law require that a driver to show his concealed handgun license if he is carrying a weapon, although in this instance Urban was not. While talking to Urban outside the vehicle, Sgt. Rangel noticed that the passenger, Talbot, had rolled his window down and was focused on Sgt. Rangel and Urban.

Sgt. Rangel and Urban then approached the passenger side of the vehicle so that Urban could retrieve the rental agreement. Urban put his entire body in the passenger side window opening when looking for the rental agreement, which made Sgt. Rangel believe that Urban was trying to keep him away from the vehicle interior. Sgt. Rangel also noticed that the vehicle's interior was messy and stained, which he characterized as giving the vehicle a "lived in" appearance. He considers this a suspicious sign because persons who carry contraband in their vehicles are frequently hesitant to leave the contraband unattended, and their conduct results in a vehicle with a "lived in" look. After Urban and Talbot searched

unsuccessfully for the rental agreement, Urban told Sgt. Rangel that the rental agreement had flown out the window when they were driving with the window down. Sgt. Rangel thought that the absence of the rental agreement was suspicious, because Urban's explanation seemed inconsistent with his initial response when asked for the agreement ("Absolutely"), and because the rental agreement would contain information such as where the vehicle was rented, who rented it, and where it is authorized to be taken.

Sgt. Rangel then asked Urban to return and stand at the rear passenger side of the car, while he approached the driver side window to talk to Talbot. Talbot told Sgt. Rangel that he was the one who had rented the vehicle, and that the two men had come from Phoenix, Arizona. Talbot said that they had traveled to Phoenix from North Carolina to check on the status of a bike (motorcycle) that he was having custom built, and they had been in Arizona for three days. Talbot also said that he shipped the motorcycle to Arizona and wanted to see the progress. He told Sgt. Rangel that no work had been done yet. Sgt. Rangel asked Talbot for his identification. During this exchange, Sgt. Rangel noticed that Talbot was uneasy, unable to keep still, twitching, and talking fast. Sgt. Rangel believed, based on his training and experience, that Talbot may have been under the influence of a drug.

Sgt. Rangel returned to the rear passenger side of defendants' car and began talking to Urban about their trip. Urban said that they had flown to Arizona to see a bike that Talbot wanted to buy, and that Talbot did not purchase the bike prior to the trip, which seemed to conflict with Talbot's explanation. Urban said that Talbot paid for the trip, and that they stayed at a hotel in Arizona, but he could not remember the name of the hotel. During this

conversation Sgt. Rangel noticed that Urban hesitated when answering questions about the details of the trip.

Based on his observations of Urban and Talbot up to that point, Sgt. Rangel believed that they were involved in criminal activity. He returned to his patrol car, conducted a routine driver license and criminal history check, and ran a check on the rental car to see if it was stolen. Sgt. Rangel then gave Urban a written warning for the traffic violations, and returned his identification. Sgt. Rangel asked Urban if they were carrying anything illegal, and Urban responded that they were not. Sgt. Rangel asked Urban for consent to search their vehicle, which Urban refused. Sgt. Rangel then told Urban that he was going to run his canine around the vehicle, and he called for backup. Approximately 10 minutes elapsed from the time when the stop began until Urban denied consent to search the vehicle.

Sgt. Rangel patted down Urban and Talbot for weapons, then had them stand away from their car so that he could run his canine around it. Soon after, DPS Trooper Christopher Lambert arrived at the scene. Sgt. Rangel deployed Triton around defendants' vehicle. According to Sgt. Rangel's testimony, their normal search pattern was to do a first pass where Triton ran around the car completely independently, and then do a second pass with high and low detail searching. Each pass began and ended at the driver's side headlight.

When Sgt. Rangel and Triton first approached the car, Triton "cast his nose" toward the vehicle; Sgt. Rangel considered Triton's action to be an odor response to narcotics. During the first pass, Triton several times stopped his search pattern and pulled Sgt. Rangel back to the front of the car, and focused on the area near the car's hood. Triton was also

- 6 -

sniffing heavily and in an excited manner. Based on Sgt. Rangel's training and experience

with Triton, he considered this behavior to be an alert.

Sgt. Rangel then had Triton do a detail pass. Sgt. Rangel testified that Triton alerted

again during the detail pass by cutting back toward the passenger door seam and pulling Sgt.

Rangel toward it. During one of the high searches, Triton stuck his nose into the driver's

window, which was open. Sgt. Rangel acknowledged that a DPS canine manual called for

rolling up the windows of a vehicle before doing a free-air sniff, but stated that this guidance

primarily applied when conducting a consent search, because without consent the officer

lacks authority to manipulate things on the vehicle, such as a window.

Sgt. Rangel testified that he considered Triton's behavior to be an alert to the odor of

drugs, which gave him probable cause to search defendants' vehicle; that Triton did not

exhibit his "final response" of biting or scratching because he did not "pinpoint" the source

of the odor, which would have required him to search inside the car; and that Triton was

trained to distinguish the odor of drugs from other odors that might interest a dog, such as

food or other dogs. Sgt. Rangel acknowledged that he did not reward Triton (such as with

a toy or praise) during the stop in this case, but he testified that he usually did not reward

Triton until after he had confirmed the presence of drugs.

Approximately eight minutes elapsed between the time that Sgt. Rangel gave the

written warning to Urban (completing the stop's original mission) and the time that Sgt.

Rangel believed Triton alerted on the vehicle.

Defense expert Jerry Potter ("Potter") testified that Triton did not properly alert to

defendants' vehicle in a way that would establish probable cause. Potter was a Master at Arms in the U.S. Navy and served as a dog handler, kennel supervisor, explosive training custodian, instructor, dog trainer, and as the noncommissioned officer in charge of the detection program at Lackland Air Force Base. He has testified as an expert approximately twelve times.

Potter opined that only the dog's final conditioned response—in Triton's case, biting or scratching—should be relied on as an indication that drugs are present. He testified that simpler behaviors, such as a canine's becoming excited or bracketing around an area, risk ambiguity between the canine's simply being curious about a smell and his conclusively responding to the odor of drugs. But Potter acknowledged an exception to this rule in cases where the canine encounters a very large amount of drugs compared to amounts that the canine has smelled before; he said that a dog in that situation might show overwhelmed behavior, such as spinning in circles, rolling on his back, or urinating, instead of exhibiting the conditioned response. On cross-examination, Potter admitted that the over 400 grams of methamphetamine present in defendants' vehicle was substantially more than the 60-100 grams of methamphetamine that Triton had been trained with.

Potter also opined that a dog's reliability may be undermined if his handler does not immediately and consistently reward him, such as with a toy, after he exhibits his final conditioned response; that Sgt. Rangel improperly departed from Triton's training by implementing a "praise-off" reward instead of a tangible toy reward; that Triton's lack of reaction to the open driver's window undermined the conclusion that he smelled drugs,

because the window was likely to be the strongest source of odor from drugs located inside the car; and that it was too easy for Sgt. Rangel to pull Triton away from the car, undermining once again the conclusion that Triton smelled drugs.

After observing Triton's reaction to defendants' vehicle, Sgt. Rangel and Trooper Lambert searched it and found a plastic bag containing approximately one pound of methamphetamine in the passenger side door pocket; smaller amounts of methamphetamine and cocaine in the glove box; and two documents that they suspected to be drug ledgers inside the car. Sgt. Rangel and Trooper Lambert arrested Urban and Talbot. The Drug Enforcement Agency South Central Laboratory later confirmed that the larger bundle seized from the car contained 497.31 grams of methamphetamine with 99% purity.

Urban and Talbot move to suppress the evidence seized in connection with the search of the vehicle, and all statements made by them at or after their arrest. Urban challenges only the existence of probable cause to search the vehicle; Talbot challenges the existence of reasonable suspicion for the traffic stop, the length of the traffic stop, the conduct of the free air sniff, and the existence of probable cause to search the vehicle. The government opposes the motions.

II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under

the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop. "Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted). Accordingly, "[t]he government bears the burden of establishing by a preponderance of the evidence [the] two elements under Terry[.]" *United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992)).

## III

The court turns first to Talbot's contention under the first prong of *Terry* that the stop was not justified at its inception.

## A

"A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.

*Johnson*, 2006 WL 1041148, at *3 (quoting *Lopez-Moreno*, 420 F.3d at 430).

B

Talbot contends that Sgt. Rangel lacked reasonable suspicion that a traffic violation had occurred.[3] Regarding the violation for driving in the left lane while not passing, he maintains that the practice is only prohibited when signs are present, *see Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013); that the requirement to comply with "Left Lane for Passing Only" signs conflicts with the requirement to move to a left lane when approaching a stopped emergency vehicle, and is therefore invalid (although no emergency vehicle was present here) (citing Code Construction Act, Tex. Govt. Code Ann. § 311.025); and that, as a factual matter, defendants did not fail to comply with the signs because their car was either preparing to pass, passing, or had just passed other vehicles.[4]

The government responds that, as evidenced by the video recording from Sgt. Rangel's dashboard camera, Urban drove in the left lane for 20 to 30 seconds while passing two sets of "Left Lane for Passing Only" signs and not passing other vehicles, which was a violation of Tex. Transp. Code Ann. § 544.004.[5] *See United States v. Rittingger*, 2017 WL

---

[3]Talbot maintains that he has standing to challenge the stop and search of the vehicle; the government does not dispute this position.

[4] Regarding the violation for changing lanes without signaling, Talbot maintains that defendants' car did not actually cross the stripe, and weaving within a lane is insufficient basis for a stop. *See State v. Tarvin*, 972 S.W.2d 910, 912 (Tex. App. 1998, pet. ref'd). As noted, *see supra* note 2, the court is not relying on this alleged traffic violation as a basis to justify the traffic stop.

[5]Tex. Transp. Code Ann. § 544.004 provides, in pertinent part:

> The operator of a vehicle . . . shall comply with an applicable official traffic-control device placed as provided by this subtitle

367491, at *6 (N.D. Tex. Jan. 25, 2017) (Fitzwater, J.) (holding that officer had reasonable suspicion to stop car that had passed "Left Lane for Passing Only" sign less than one mile earlier), *appeal docketed*, No. 17-10804 (5th Cir. July 21, 2017).[6]

C

The government proved by a preponderance of the evidence that the stop of defendants' vehicle was justified at its inception. Because Sgt. Rangel observed the vehicle pass two sets of "Left Lane for Passing Only" signs without returning to the right lane, and while not passing other vehicles, he had reasonable suspicion that the driver had violated Tex. Transp. Code Ann. § 544.004. *See id.* The video recording supports Sgt. Rangel's testimony that defendants occupied the left lane for a substantial period of time while not passing; the recording shows, at a minimum, that after Sgt. Rangel's view was no longer obscured by a semi truck, the white Ford Mustang drove in the left lane for approximately 15 seconds before Sgt. Rangel's approach from behind (in the right lane) made it impractical for the Mustang to change lanes. Although another semi truck is visible farther down the highway during this interval, the video supports Sgt. Rangel's testimony that defendants were

---

. . .
(b) A provision of this subtitle requiring an official traffic-control device may not be enforced against an alleged violator if at the time and place of the alleged violation the device is not in proper position and sufficiently legible to an ordinarily observant person.

[6] The government also contends that defendants' car crossed the center stripe without signaling, which the court need not consider as a basis for the stop. *See supra* note 2.

too far behind the truck to reasonably be considered "passing" it.

And the court disagrees with Talbot's contention that use of "Left Lane for Passing Only" signs, *see* Tex. Transp. Code Ann. § 544.011, is facially invalid for conflicting with the requirement that vehicles vacate the lane closest to a stopped emergency vehicle, *see id.* § 545.157. These two traffic laws are not "irreconcilable," as Talbot suggests, but can readily be harmonized. *See* Code Construction Act, Tex. Govt. Code Ann. § 311.025. For example, a vehicle using the left lane to drive by a stopped emergency vehicle could be considered to be "passing" that vehicle, thus complying with "Left Lane for Passing Only" signs.

Moreover, even if the court accepts Talbot's argument that the prohibition on using the left lane while not passing was superseded by the requirement to vacate the lane nearest an emergency vehicle, Sgt. Rangel still had reasonable suspicion that a traffic violation had been committed. According to the Supreme Court, reasonable suspicion exists when a police officer stops a car based on an interpretation of state traffic law that is later rejected by the state's courts, so long as the officer's mistake of law was reasonable. *See Heien v. North Carolina*, ___ U.S. ___, 135 S. Ct. 530, 540 (2014). Even a traffic stop based on a statute that is later held unconstitutionally vague is not a Fourth Amendment violation. *See United States v. Inocencio*, 40 F.3d 716, 728 (5th Cir. 1994). "A prudent officer, in the course of determining whether respondent had committed an offense, should not have been required to anticipate that a court would later hold the ordinance unconstitutional." *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979)) (ellipsis omitted). Accordingly, even

if a state court later holds that the "Left Lane for Passing Only" law was superseded by the emergency vehicles law, it was nevertheless objectively reasonable for Sgt. Rangel to enforce the presumptively valid left lane passing law. *See Heien*, 135 S. Ct. at 540.

IV

The court now turns to Talbot's contention that the length of the stop was not reasonably related to the circumstances that justified it.

A

Under the second prong of *Terry*, the court asks whether the officer's actions after stopping defendants' vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507. "An officer's conduct is reasonably related to the justification for the stop when the officer 'diligently pursues a means of investigation that is likely to confirm or dispel the officer's suspicions quickly.'" *United States v. Escamilla*, 852 F.3d 474, 482 (5th Cir. 2017) (quoting *United States v. Pack*, 612 F.3d 341, 361 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010)) (brackets omitted). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Pack*, 612 F.3d at 350; *see also United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile

registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015); *Pack*, 612 F.3d at 350)).

"'If the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion.'" *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (brackets in original) (quoting *Pack*, 612 F.3d at 350). As explained above, "reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officer[s]." *Id.* at 631-32 (citation omitted).

## B

Talbot contends that the stop unlawfully exceeded the time necessary to complete its purpose. He maintains that a dog sniff is separate from the traffic violation and requires its own reasonable suspicion, *see Rodriguez*, 135 S. Ct. at 1612; that Sgt. Rangel lacked additional reasonable suspicion to prolong the stop after issuing the written warning to Urban; that Sgt. Rangel failed to articulate a particular and objective basis for suspecting wrongdoing beyond the traffic violation, *see United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999); and that Sgt. Rangel improperly delayed defendants while gathering a

large amount of innocuous information that never amounted to reasonable suspicion.

The government responds that, by the time Sgt. Rangel issued the written warning to Urban, he had reasonable suspicion that defendants were engaged in further criminal activity. It posits that Sgt. Rangel has 12 years of law enforcement experience, including three years as a technical trainer for canines; that he supervises canine handlers and canines in his region; and that he has made over 30 stops that resulted in large narcotics seizures. *See Pack*, 612 F.3d at 361 (according "significant weight" to officer's seventeen years of experience). The government maintains that Interstate 40 is a well-known drug trafficking corridor; that Urban and Talbot showed signs of extreme nervousness; that details of their stories conflicted (such as whether Talbot owned the motorcycle and whether work had been done on it); that defendants' car had a California license plate and they were traveling from Arizona, each of which is a common source of drugs, en route to other parts of the United States; that the vehicle appeared to have been "lived in," and defendants could not produce the rental agreement; that defendants had flown to Arizona and were returning over 2000 miles to North Carolina in a rental vehicle for an implausible reason; and that Urban had limited information or was hesitant in answering questions about details of the trip.

## C

The government proved by a preponderance of the evidence that the stop was not unreasonably prolonged. Sgt. Rangel has had 12 years of law enforcement experience, and "[i]n evaluating whether or not an officer's suspicion is reasonable, 'due weight must be given to the specific reasonable inferences which he is entitled to draw from the facts in light

- 17 -

of his experience.'" *Pack*, 612 F.3d at 352 (quoting *Terry*, 392 U.S. at 27) (ellipsis omitted). During the first 10 minutes of the stop—from its beginning until the time when Urban received the written warning and denied consent to search—Sgt. Rangel asked questions about topics related to the stop, such as the vehicle's ownership and the trip itinerary, *see Pack*, 612 F.3d at 350, and also asked follow-up questions in a "graduated response to emerging facts," *see Brigham*, 382 F.3d at 509. This phase of the stop was reasonably related to the circumstances that justified the stop and to dispelling reasonable suspicion developed during the stop. *See Brigham*, 382 F.3d at 507.

And Sgt. Rangel's decision to detain defendants for an additional eight minutes to conduct the free-air sniff was likewise not unreasonable. Sgt. Rangel observed facts that have been held by the Fifth Circuit to support reasonable suspicion, including nervousness, conflicting stories, and travel on a known drug trafficking route, *see Pack*, 612 F.3d at 362; and beyond meeting this recognized standard, he observed additional facts that suggested criminal activity, such as the absence of the rental agreement and the unusual itinerary of flying from North Carolina to Arizona and then driving back in a rental car. Under the totality of the circumstances Sgt. Rangel had reasonable suspicion to investigate further. *See Andres*, 703 F.3d at 833.

V

The court next addresses Talbot's contention that the canine free-air sniff was improperly conducted and became an unlawful search.

Talbot maintains that opening the passenger compartment prior to a free-air sniff converts the procedure into a search, which is unlawful if the officer does not yet have probable cause. *Cf. United States v. Place*, 462 U.S. 696, 707 (1983) (holding that canine sniff of luggage was not a search if luggage remained closed). He contends that Sgt. Rangel performed an unreasonable search, rather than a proper free-air sniff, because Sgt. Rangel initially caused Urban to roll down the driver's window, remained in control of the scene and never provided an opportunity to roll the window up, and then allowed Triton to stick his nose through the driver's window during the free-air sniff.

Sgt. Rangel testified that the point was inconsequential in this case, because Triton had already alerted to the vehicle by the time he stuck his nose into the window, and so Sgt. Rangel already had probable cause to search it.

In closing argument, Talbot's counsel contended that this explanation was insufficient, because as soon as Sgt. Rangel began the free-air sniff with the added benefit of an open window that increased air flow out of the car, he exceeded the level of access normally associated with a free-air sniff, which transformed it into a search.

B

Because, as set out below, the court agrees that Sgt. Rangel had probable cause to search the car by the time Triton stuck his nose into the window, the court concludes that this act by Triton was not an unreasonable search. *See infra* § VI.

And Talbot's contention that having the window open at all converted the free-air

sniff into a search does not appear to be supported by controlling precedent. The case Talbot

cites, which held that a canine sniff was not a search if a piece of luggage remained closed,

is based on limiting officers' view of the luggage's contents, not limiting the ability of odors

to flow through an opening. *See Place*, 462 U.S. at 707 ("A 'canine sniff' by a well-trained

narcotics detection dog, however, does not require opening the luggage. It does not expose

noncontraband items that otherwise would remain hidden from public view, as does, for

example, an officer's rummaging through the contents of the luggage."). And Talbot does

not argue that opening the car's transparent window permitted any greater visibility into the

car.

Finally, Talbot's position, if credited, would essentially place an officer like Sgt.

Rangel in a impossible position. Before Sgt. Rangel and Triton conducted the free-air sniff,

Sgt. Rangel took safety precautions by patting down Urban and Talbot and directing them

to stand away from their car. Had Sgt. Rangel directed Urban or Talbot to enter the car and

roll the window up, this could have compromised the safety precautions he had taken. And

had Sgt. Rangel opened the vehicle door himself so that he could roll up the window before

conducting the free-air sniff, Talbot would no doubt be arguing that Sgt. Rangel converted

the free-air sniff into a search.

## VI

The court now turns to defendants' contention that Sgt. Rangel lacked probable cause

to search their car because his drug detecting canine did not properly alert.

## A

"[W]arrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause." *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993). "[A]n alert by a drug-detecting dog provides probable cause to search" a vehicle. *Sanchez-Pena*, 336 F.3d at 444. When a defendant challenges "the reliability of the dog overall or of a particular alert," then "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

## B

Defendants contend that Triton did not behave in a way that would suggest probable cause to a reasonably prudent person. They contend that Triton did not to alert to defendants' vehicle because he did not bite or scratch it, which was his consistent alert method in documented training; that requiring a final alert (or responses sufficiently distinct from normal dog behavior) is necessary to ensure that searches are reasonable; that Triton showed less interest in the passenger door (where drugs were ultimately found) than in other areas of the car; that the weather on the day of defendants' stop was 55° with 29-mile-per-hour winds, which could explain Triton's heavy sniffing; and that cases in which probable cause was established by odor responses short of final alert are distinguishable because, in those cases, environmental factors explained the dog's reluctance to come to final alert, *see United States v. Clayton*, 374 Fed. Appx. 497, 502 (5th Cir. 2010) (per curiam) (quoting

testimony that dog's interest included area "underneath" vehicle); *United States v. Shen*, 2017 WL 2378289, at *4 (N.D. Tex. June 1, 2017) (Fitzwater, J.) (summarizing testimony that dog did not sit (which was dog's final alert) because dog did not like water, and there was water on the ground).

The government responds that, although Triton did not come to his final response, he alerted to the scent of narcotics odors in a way that provided Sgt. Rangel with probable cause to search the car. It maintains that Sgt. Rangel and Triton have been certified together multiple times in controlled environments, including both before and after the stop of Urban and Talbot; that Sgt. Rangel articulated specific behaviors that signaled the presence of drugs in defendants' car, such as Triton's casting his nose toward the car on approaching it, stopping and pulling Sgt. Rangel toward the front multiple times, and breathing heavily and in an excited manner; that Sgt. Rangel has seen Triton signal the presence of drugs this way on prior occasions; and that these behaviors gave Sgt. Rangel probable cause to search defendants' car, *see Clayton*, 374 Fed. Appx. at 502 (holding that final alert behavior is not required, so long as officer can articulate behaviors that signaled presence of drugs).

C

The government proved by a preponderance of the evidence that Triton's behavior was sufficient to establish probable cause to search the car. The government established that, viewed through the lens of common sense, Triton's odor response behaviors, in combination with Triton's and Sgt. Rangel's training and experience, would have made a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *See*

*Harris*, 568 U.S. at 248.

Sgt. Rangel and Triton were certified together and had operated significantly in the field together. Triton's annual certifications establish that he could reliably detect the odor of drugs in a controlled environment. And Sgt. Rangel articulated odor responses short of final response that established probable cause to search the car, including that Triton cast his nose toward the vehicle, cut back toward the front of the vehicle multiple times, and was sniffing heavily and in an excited manner. The video recording of the traffic stop corroborates Sgt. Rangel's testimony because it shows Triton stopping and pulling Sgt. Rangel back to the front of the car approximately three times, instead of making an initial continuous loop around the car, as he normally did.

The Fifth Circuit in *Clayton* held that a "full alert" is not required to establish probable cause. *See Clayton*, 374 Fed. Appx. at 502. "So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs." *Id*. Although *Clayton* is unpublished, it is nevertheless persuasive. And defendants' attempt to distinguish *Clayton* lacks force, because the Fifth Circuit did not rely on the existence of an external explanation for the dog's failure to come to final alert. *See id.* Viewing all these facts through the lens of common sense, a reasonably prudent person would think that a search of defendants' car would reveal contraband or evidence of a crime. *See Harris*, 568 U.S. at 248.

Defense expert Potter's testimony—including that a final conditioned response should

be required to ensure reliability, and that Sgt. Rangel should consistently and immediately reward Triton for his performance—does not undermine this conclusion, because this type of "best practices" opinion for working with drug detecting dogs does not change the legal standard explained above. *See United States v. Masterson*, 450 Fed. Appx. 348, 349 (5th Cir. 2011) (per curiam) (affirming conclusion that canine handling expert's testimony was irrelevant because each dog's particular alert behavior must be interpreted by his handler).

The court therefore holds that law enforcement officers had probable cause based on Triton's free-air sniff to search defendants' vehicle.

\* \* \*

Accordingly, for the reasons explained, the court denies Urban's and Talbot's motions to suppress.

**SO ORDERED**.

August 28, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE